MARLAND, Gov., et al. v. HOFFMAN.

No. 28408. Feb. 21, 1939.

Rehearing Denied April 11, 1939.

Mac Q. Williamson, Atty. Gen., and F. M. Dudley, Asst. Atty. Gen., for plaintiffs in error.

Chas. West and Billups, Billups & Billups, for defendant in error.

HURST, J. Roy Hoffman is the holder, as trustee, of certain warrants issued by the State Auditor during the years 1911 and 1912. Part of the warrants were issued to the Leader Company and the Leader Printing Company for sundry printing purposes, but most of the warrants involved herein were issued in connection with the compilation and publication of the "Oklahoma Red Book", a two volume set of books comprising a history of early Oklahoma and the territories out of which the state was formed. The book was printed by the Democrat Publishing Company, or the Tulsa Democrat, under a purported contract be-

tween it and the State of Oklahoma, "acting by and through the State Printer", and purporting to have been approved by the State Board of Affairs.

The warrants in question remained outstanding and unpaid. In 1935, the Legislature passed an act (art. 1, ch. 27, S. L. 1935) authorizing the funding of outstanding legal indebtedness represented by treasury notes "and by valid warrants drawn against the general revenues of the state pursuant to appropriations made by the Legislature for any fiscal year prior to the fiscal year beginning July 1, 1935", and authorized the issuance of funding bonds therefor. Thereafter, Hoffman petitioned the State Board of Equalization to proceed before the Supreme Court as provided by the act to fund the warrants involved herein. The board by resolution refused to apply to the Supreme Court to fund these warrants on the ground that they are invalid and do not constitute a legal indebtedness of the state.

Thereupon, Hoffman filed this action seeking a writ of mandamus to compel the Board of Equalization to apply to the Supreme Court under the funding act to fund his warrants. The trial court granted the writ "in order that the Supreme Court may hear and determine the validity of said warrants and whether the same should be funded". The State Board of Equalization brings this appeal.

■ It is first contended by the State Board of Equalization that it is an executive board and is charged with the exercise of judgment and discretion in ascertaining the validity of the outstanding warrants and in making application to the Supreme Court to fund such warrants as they find to be valid, and therefore its acts cannot be controlled by mandamus, in the absence of abuse of discretion. It is then argued that the warrants are invalid for several reasons and consequently there has been no abuse of discretion and the writ should not lie.

Plaintiff does not deny that the Board of Equalization is an executive board, but contends that the board is required to submit all warrants to the Supreme Court, where the act has vested "exclusive jurisdiction" to determine their "validity". It is argued on the one hand that it is the administrative duty of the board to make application to the Supreme Court to fund the warrants and, on the other hand, that the board acted arbitrarily and abused its discretion in refusing to do so.

Section 3 of the Funding Act of 1935 provides in part:

"The State Board of Equalization shall ascertain the treasury notes and **valid** outstanding warrants to be funded under this act, and said board is authorized to file applications in the name of the state of Oklahoma with the Supreme Court of this state to fund the same. * * * Exclusive original jurisdiction is hereby conferred upon the Supreme Court to hear and determine said applications to fund."

It is further provided that notice shall be given that on a day named "the State of Oklahoma will make a showing and ask the court to hear and determine the amount of the legal outstanding indebtedness of the state, represented by the treasury notes or warrants sought to be funded, and to approve the funding bonds to be issued for the purpose of paying or canceling the same".

Section 4 provides in part:

"On the day named in the notice or on such other day as the court on that day shall fix, the Attorney General shall present the application for the State Board of Equalization to the Supreme Court, and make proofs to the satisfaction of the court of the existence, **validity** and amount of the treasury notes or warrants sought to be funded. On such proof being made, the court shall render its written opinion with reference to the existence, **validity**, and amount of the treasury notes or warrants sought to be funded, and with reference to whether the court approves or disapproves the issuance of the series of funding bonds involved in the particular application heard."

The language of the act is not altogether explicit, but the intention is clear. The act confers the duty upon the board to ascertain the **valid** outstanding warrants to be funded, which, of course, requires a determination by the board of the validity of the warrants. The same sentence then authorizes the board to file application with the Supreme Court to "fund the same". And the funding proceedings entail a determination by the Supreme Court of the validity of the warrants. The act then gives to the Supreme Court exclusive jurisdiction to hear and determine "said applications to fund". Thus it appears that in the first instance the board is given a duty requiring the exercise of judgment and discretion to ascertain the validity of the warrants outstanding against the state. But this determination is not judicial. Afetr deciding, in its discretion, which warrants are valid, the board is "authorized" (and we construe this to be mandatory) to present such war-

rants to the Supreme Court, where the validity thereof is judicially determined.

It is true, as a general rule, that mandamus will not issue to control the exercise of discretion. Yet when there is an arbitrary abuse of discretion, or if by a mistaken view of the law, there has been in fact no actual exercise in good faith of the judgment or discretion vested in the officer, the courts recognize this as an exception to the general rule, and mandamus may issue if there is no other adequate remedy, though the result is that the court is called upon to review the exercise of a discretionary power. Board of Com'rs of Seminole County v. State ex rel. Cobb (1912) 31 Okla. 196, 120 P. 913; 18 R. C. L. 126, sec. 39; 38 C. J. 608, sec. 85. Thus, if the board refused to include certain warrants in an application to fund, under a mistaken view of the law that the warrants were invalid, there would in fact be no valid exercise of discretion and mandamus would lie. We must, therefore, look into the validity of the warrants to determine if the board acted under a mistaken view of the law.

In entering into this consideration, we are governed by the universal rule that a party applying for a writ of mandamus must show, in the first instance, a clear legal right thereto. Witt v. Wentz (1930) 142 Okla. 128, 286 P. 796; Purcell-Lexington Toll Bridge Co. v. Leeper (1931) 148 Okla. 27, 296 P. 969; 38 C. J. 582, sec. 56. In other words, it is incumbent upon plaintiff to show clearly and without a reasonable doubt that the warrants in question are valid, so as to establish his right to the writ on the ground that the board acted under a mistaken view of the law in holding the warrants invalid.

(a)  As to the "Red Book" warrants, plaintiff wholly failed to make such a showing, for there is no authority by law for the compilation and printing of the books at the expense of the state. Many of the warrants were issued to the State Printer for labor and expense incurred in compiling the books. The others were issued under the contract for the printing entered into on behalf of the state by the State Printer and appearing to be approved by the State Board of Affairs. The State Printing Board was created by chapter 65, S. L. 1907-8, and authority was given the board to appoint a State Printer. The State Printer was empowered, under the direction of the board, to "superintend, supervise, and contract for all public printing and binding **required** by the Legislature, the Governor, Supreme Court, and several state institutions, state officers, or any state board or commission created under the laws of the state". He could make no contract for printing "except such as in the judgment of the state board [was] necessary."

By article 1, ch. 37, S. L. 1909, the State Board of Public Affairs was created and took over the supervision of the State Printer (sec. 8) and was authorized to "contract for, purchase and acquire all * * * supplies of every kind or description **for the use of** the state or its officers, * * * including printing, stationery, fuel, tools, implements, furniture, books, food, clothing and medical supplies **where the law requires the state to furnish the same."**

By a subsequent act (ch. 130, S. L. 1910-11) the Legislature defined the duties of the State Printer, requiring him to prepare plans and specifications for public printing, to prepare advertisements for bids, to examine and report on the correctness of claims and to keep books of all printing used. The only authority given him with reference to making contracts was that "contract for printing and binding where the amount is less than two hundred dollars may be let by the State Printer with the approval of the State Board of Affairs, by private contract", providing the board shall prepare a schedule of prices. The purpose for which contracts would be made was not there mentioned.

Thus it will be seen that authority was conferred upon the State Board of Public Affairs, and the State Printer, to make contracts only for printing as required for the use of the state or its officers, or where the law requires the state to furnish the same. The books in question were not required for the use of the state or its officers in any proper sense, but were merely history books designed for general circulation. Therefore, neither the State Board of Public Affairs nor the State Printer was authorized by law to contract for the compilation and printing of the "Oklahoma Red Book".

Plaintiff's contention that the state is bound by the contract because it accepted the benefits is without merit, since this is an action against the state, which can only expend its money in accordance with law. Lingo-Leeper Lumber Co. v. Carter (1932) 161 Okla. 5, 17 P.2d 365.

(b)  There remains to be considered one warrant issued to the Democrat Chief and other warrants to the Leader Company and the Leader Printing Company, for purposes other than the publication of the Red Book.

Defendant's evidence discloses that the warrant to the Democrat Chief was based upon a contract in excess of $200 without the letting of bids, and is thus invalid; that one warrant to the Leader Company is invalid because it was in excess of the contract upon which it was based; that three other warrants to the Leader Company are invalid because the claims for printing, in payment of which they were issued, were not approved by the Board of Affairs; that the remaining warrants are invalid because the contracts upon which they were based were not approved by the Board of Affairs. The invalidity of these warrants appears from audits and reports prepared by the State Examiner and Inspector.

Plaintiff, to establish the validity of these warrants, relies chiefly upon a presumption of validity of warrants regular on their face, and upon the oral testimony of the State Auditor who issued the warrants to the effect that the contracts were approved by the Board of Affairs. Plaintiff argues that a mandamus action is a suit at law and this court on appeal is governed by the rule that the findings and judgment of a court, in an action at law, will not be disturbed if there is any competent evidence reasonably tending to support them, citing Territory ex rel. Galbraith v. Chicago, R. I. & P. Ry. Co., 2 Okla. 108, 39 P. 389, decided in 1894.

But under our Constitution and statutes, "mandamus is a special proceeding, addressing itself to the equity powers and conscience of a court or judge, for the enforcement of a clear legal right, for which the law provides no adequate proceeding". Feuquay v. McAlister (1924) 102 Okla. 164, 228 P. 487. Under the evidence, to say the least, the validity of these warrants is doubtful. Plaintiff has not shown by evidence clear and free from doubt that the board acted under a mistaken view of the law in holding these warrants invalid.

Holding, as we do, that the burden was upon plaintiff in the mandamus proceeding to establish the validity of the warrants, his contention that they are presumed to be valid is not applicable, and plaintiff having failed to show a clear right to the writ, the judgment of the trial court is reversed, with directions to enter judgment denying the writ.

BAYLESS, C. J., WELCH, V. C. J., and RILEY, CORN, GIBSON, and DAVISON, JJ., concur. OSBORN and DANNER, JJ., absent.